## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SOCLEAN2 PTY LTD, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 4:18-cv-40054 |
| SOCLEAN, INC., | ) | |
| Defendant. | ) | |

## COMPLAINT AND JURY DEMAND

Plaintiff SoClean2 Pty Ltd ("Distributor"), by and through its undersigned attorneys, alleges as follows for its Complaint against Defendant SoClean, Inc. ("Defendant"):

## NATURE OF THE ACTION

1.      This action arises out of Defendant's illegal, bad-faith termination during the first year of a five-year Distribution Agreement it entered into with Distributor (the "Agreement"), whereby Distributor was granted the exclusive right to distribute Defendant's products in Australia, New Zealand, Singapore, Malaysia, Indonesia, Philippines, Thailand, Japan, Hong Kong, Macau, South Korea, and Taiwan (the "Territory").

2.      Generally speaking, the Agreement allowed Distributor to purchase Defendant's products at wholesale prices and then sell the products in the Territory.  Under this model, Distributor spent substantial time and money developing relationships with Durable Medical Equipment re-sellers ("DMEs") and other customers, and increasing sales of Defendant's products in the Territory from nothing to a substantial book of business.  Distributor also worked with various regulatory agencies to obtain the necessary approvals to sell products in their respective countries.

3.     However, less than one year after Defendant entered into the five-year Agreement—and almost immediately after it was acquired by a private equity firm—Defendant decided that it could make more money marketing and selling its products directly to consumers, and undertook an illicit scheme to cut out its international distributors, including Distributor.

4.     Unfortunately for Defendant, the Agreement—which had more than four years left on its term—was an obstacle to Defendant's new sales and marketing strategy.  Recognizing that the Agreement prevented it from pursuing this new strategy, Defendant hatched a plan to get out from under its obligations in the Agreement and, in the process, to destroy Distributor's business.

5.     Notwithstanding that the Agreement was in full force and effect, in early 2018, Defendant's management team travelled to Australia to meet with Distributor with the goal of negotiating new terms that would allow it to cut Distributor out and begin selling directly to consumers in the Territory, initially feigning ignorance of the existence of the Agreement, and then making a lowball offer to effectively buy Distributor out of it.

6.     After Distributor refused to capitulate to Defendant's unreasonable demands, Defendant terminated the Agreement on the grounds that Distributor had allegedly failed to make timely payments on certain invoices.  As set forth in more detail herein, however, that was simply not true, and it was contrary to the parties' longstanding course of conduct with respect to the payment of invoices.

7.     Rather, the parties' course of conduct over multiple years—which was initially proposed by Defendant's then-President, and accepted by Distributor—had been to offset invoices with "commissions" that were owed to Distributor by Defendant for sales made in Distributor's Territory but for which Defendant was paid directly.  Under this well-established course of dealing,

Distributor was current on all invoices (or would be shortly as a result of outstanding commissions that were about to accrue and would more than offset any invoices).

8.      Defendant's reason for terminating the Agreement was thus mere pretext.

9.      Defendant's abrupt, bad-faith termination of the Agreement has decimated Distributor's business, irreparably harmed its relationships with its customers, and left it with no ability to earn income or even time to wind down its business with Defendant properly—including disposing of unsold inventory. Meanwhile, Defendant will unjustly benefit from the fruits of Distributor's hard work and substantial investments in developing international markets and gaining approvals from international regulators.

10.     Consequently, Distributor now brings suit against Defendant for breach of the Agreement, breach of the implied covenant of good faith and fair dealing, unfair and deceptive business practices in violation of Mass. Gen. Laws ch. 93A, §§ 2, 11 ("Chapter 93A"), and unjust enrichment.  Distributor seeks damages for lost profits and investments, harm to its business and customer relations, compensation for its efforts and expenditures in obtaining regulatory approval for Defendant's products in various countries, attorney's fees and costs, and treble damages under Chapter 93A.

## THE PARTIES AND OTHER RELEVANT PERSONS

11.     Plaintiff SoClean2 Pty Ltd is an Australian proprietary company with its principal place of business in Narrabeen, Australia.  SoClean2 Pty Ltd is owned by Rischeh Kumarasinghe.

12.     Defendant SoClean, Inc. is a corporation organized under the laws of the Commonwealth of Massachusetts with its principal place of business in Oxford, Massachusetts.

13.     Non-party DW Management Services, LLC d/b/a DW Healthcare Partners ("DW Healthcare") is a Canadian limited liability company with its principal place of business in Toronto, Canada.

## JURISDICTION AND VENUE

14.     This Court has diversity jurisdiction, pursuant to 28 U.S.C. § 1332(a), because this action and controversy is between citizens of different states and exceeds the value of $75,000, exclusive of interest and costs.

15.     This Court has personal jurisdiction over Defendant because it is a citizen of the Commonwealth of Massachusetts.  Venue is proper in the United States District Court for the District of Massachusetts, pursuant to 28 U.S.C. § 1391(b), because Defendant resides and conducts business in this District and Defendant committed unfair and deceptive trade practices within this District.  Moreover, in Section 25 of the Agreement, both parties irrevocably submitted to the jurisdiction of any Massachusetts state or federal court located in Massachusetts in any action or proceeding arising out of or relating to the Agreement.

## ALLEGATIONS COMMON TO ALL COUNTS

### Distributor Establishes Relationship with Defendant

16.     Rischeh Kumarasinghe ("Rischeh") is the owner of Distributor.  Rischeh has worked for 25 years on behalf of major global healthcare corporations establishing new markets in territories outside of the United States, particularly in Asia, Europe, and Australia.

17.     Nada Sekulich ("Nada") is Rischeh's wife and worked for Distributor.  Nada is an attorney who has worked for a major Australian law firm and as in-house corporate counsel.

18.     Defendant manufactures products that clean and sanitize consumer Continuous Positive Airway Pressure ("CPAP") equipment.  CPAP equipment is used for treating breathing

problems, such as sleep apnea.  Defendant's primary product is a CPAP sanitizer called the SoClean2.

19.     In 2014, Distributor entered into a Distribution Agreement (the "2014 Agreement") with Inceptus, Inc., d/b/a Better Rest Solutions, Defendant's corporate predecessor.

20.     The 2014 Agreement granted Distributor the exclusive right, for a term of two years, to market and sell Defendant's products in Australia, New Zealand, and much of Asia.

21.     Prior to Distributor selling Defendant's products in the Territory, SoClean did not sell any products there.

22.     Distributor has never sold any products other than those manufactured by Defendant.  In other words, the sale of Defendant's products accounted for 100% of Distributor's business and income.

23.     The 2014 Agreement was negotiated by and signed by Defendant's then-President, Mike Schmidt.

24.     Distributor enjoyed a strong working relationship with Mr. Schmidt, who was consistently complimentary of Distributor's efforts to expand markets for Defendant's products in the Territory.

25.     Throughout 2014 and 2015, Distributor worked in close collaboration with Mr. Schmidt on pricing strategies for Defendant's products, expanding sales in the Territory, and working to obtain approval from government regulators to allow Defendant's products to be sold in the various countries in the Territory.

26.     In Australia and most Asian countries, Defendant's products are classified as medical devices, requiring regulatory approval before sales can commence.

27.     In April 2015, Distributor obtained regulatory approval for Defendant's products from Australia's Therapeutic Goods Administration ("TGA")—Australia's equivalent to the United States' Food and Drug Administration ("FDA").  Distributor invested approximately 168 hours and almost $8,000 of its limited time and capital completing this arduous process.

28.     After obtaining TGA approval in Australia, Distributor began selling Defendant's products to DMEs and other customers there.

29.     Distributor spent substantial time and resources building up a network of over 200 DMEs across Australia.

30.     Based on Distributor's investments in time and capital to develop customers in the Territory, Distributor's sales of Defendant's products increased each year.

**Distributor Undertakes to Obtain Regulatory Approval in Asia**

31.     In addition to obtaining regulatory approval in Australia, Distributor has spent substantial time and resources to obtain approval to sell Defendant's products in Japan and other Asian countries.

32.     Medical devices in Japan are regulated by the Ministry of Health, Labour and Welfare ("MHLW").  The MHLW assigns medical devices to one of four classes, from Class I for products presenting no risk, up to Class IV for high risk products.

33.     A product's classification also dictates whether the product is required to obtain certification from the Pharmaceuticals and Medical Devices Agency ("PMDA"), a division of the MHLW that is similar to the FDA.  The lower the class, the less onerous the approval process.

34.     Once the categorization has been determined, the next step is to submit relevant documentation to the regulatory authorities.  That process can take six to twelve months.

35.     In light of this onerous process, Distributor engaged a Japanese business consultant with experience in the respiratory and sleep apnea market segment to assist in identifying a regulatory consultant, identifying potential local distribution partners, and liaising with specific key opinion leaders in Japan.

36.     Distributor also engaged a well-respected and experienced regulatory consultant who specializes in medical devices to obtain regulatory approval in Japan.

37.     Distributor's regulatory consultant has engaged in substantial communications and negotiations with the PMDA regarding the class in which Defendant's products will be classified.

38.     Distributor lobbied to obtain a Class I approval, which would require a less onerous approval process, meaning that Defendant's products could be sold there sooner.

39.     Until recently, Distributor was still waiting on the PMDA and MHLW to provide a list of requirements to continue the approval process.  Distributor estimates that this process will take approximately three to six months.

40.     In addition to working with the regulatory consultant, Distributor has leveraged its broad network of contacts built up over 20 years of bringing medical devices to market in Japan to assist in obtaining approval of Defendant's products as Class I devices.

41.     Distributor has also obtained regulatory approval in Taiwan, where Defendant's products are designated as Class I devices, and Korea, where Defendant's products are designated as Class II devices.  In total, Distributor has spent over 300 hours to obtain the necessary regulatory approvals in Asia.

### The Parties Agree to an "Offset Program" for Payment of Invoices and Commissions

42.     In addition to expanding the market for Defendant's products in Australia, as noted above, Distributor also began marketing and selling products to customers in various Asian countries under the 2014 Agreement.

43.     One issue that arose from sales to Asian customers was that the customers would pay in U.S. dollars, which would have to be exchanged into Australian dollars to be deposited into Distributor's Australian bank account, and then, when Distributor would pay invoices from Defendant, those Australian dollars would have be exchanged back into U.S. dollars to be deposited by Defendant.

44.     Each transaction would incur fees to exchange the currencies and was subject to fluctuations in currency exchange rates.

45.     To address this problem and avoid unnecessary fees, Distributor proposed having its Asian customers pay Defendant directly for the products, and then Defendant would transfer the amount of Distributor's profit margin back to Distributor as a so-called "commission."

46.     On May 6, 2015, Mr. Schmidt responded to this proposal on behalf of Defendant via e-mail, and stated:  "One thought I had is that we can put a credit in your account against invoice and save all of [*sic*] some . . . costs of transferring funds."

47.     Distributor agreed to this suggestion, and the parties thus began to operate under this "offset program," and did so through the end of their relationship.

48.     Defendant's accounting department kept track of purchases by Asian customers and Distributor's resulting commissions. The general practice was for Defendant to apply commissions it owed to Distributor against any outstanding invoices, which at times covered the entire invoice and sometimes resulted in a surplus owed to Distributor.

49.     For example, if sales to Asian customers generated $15,000 in commissions owed to Distributor, and Distributor owed outstanding invoices in the amount of $15,000, then Defendant would credit $15,000 to pay off the invoices

50.     However, typically the commissions and invoices did not match up dollar for dollar, and the accounts were not usually reconciled on a regular basis (monthly or otherwise).

51.     For example, in some months Distributor's commissions exceeded the amount invoiced, in which case, the commissions would completely offset the invoices and the excess commissions would be rolled over and applied towards future invoices or would be transferred to Distributor.

52.     In other months, Distributor's commissions would be less than the invoiced amounts, in which case the invoiced amounts would be carried over and future commissions would offset those amounts, or Distributor would pay the balance to Defendant.

53.     There was no regular reconciliation of the two accounts (monthly or otherwise), largely because Distributor often made sales in one month for which commissions would be earned, but such commissions did not become payable until the customer paid Defendant, which could be 30 days later.   As such, there was no reason for Distributor to pay invoices within the 45-day payment period set forth in Section 21 of the Agreement, nor did Defendant ever hold Distributor to that term once the offset program was implemented.

54.     The parties operated under this course of dealing from June 2015 through the termination of their relationship.  During this time, Defendant never demanded payment for late invoices because over time, through a combination of the offset program and direct payments from one party to the other (depending on the circumstances), the accounts would reconcile.

55.     Since June 2015, Distributor's and Defendant's accounting departments, as well as Defendant's President (Mr. Schmidt), until he vacated his role in 2018, worked harmoniously and effectively together ensuring that invoices were offset against commissions and direct payments as evidenced by myriad e-mail communications.

56.     Distributor reasonably understood that the parties had adopted the offset program and would conduct themselves in accordance therewith until further notice, and relied thereon in not remitting all payments within 45 days of the invoice (or demanding payment of commissions as soon as they were earned).

57.     Both parties benefitted from this arrangement because it avoided certain foreign transaction fees and currency fluctuations, and because Defendant was paid much sooner than it otherwise would have been and could show the monies in its accounts as an accrual.

### The Parties Renew the Agreement

58.     On April 3, 2017, Distributor entered into a new Distribution Agreement (previously defined herein as the "Agreement") with Defendant.  The Agreement is substantially similar to the 2014 Agreement other than that Defendant is identified by its current corporate name, SoClean, Inc., and the term of the Agreement was five (5) years, though April 2, 2022.

59.     The Agreement was signed by Mr. Schmidt as President of Defendant.

60.     The Agreement granted Distributor the exclusive right to distribute Defendant's products in Australia, New Zealand, Singapore, Malaysia, Indonesia, Philippines, Thailand, Japan, Hong Kong, Macau, South Korea, and Taiwan (previously defined herein as the "Territory").

61.     The Agreement prohibited Defendant from knowingly selling products to anyone other than Distributor within the Territory.

62.     Under the Agreement, Defendant was required to refer any party inquiring about the purchase of products within the Territory to Distributor for handling.

63.     Distributor was responsible for marketing Defendant's products in the Territory, subject to Defendant's rights to approve or disapprove of Distributor's use of Defendant's

trademarks and Distributor's rights to be reimbursed by Defendant for a percentage of its marketing costs.

64.     The Agreement anticipated that Defendant may, from time to time, engage in direct marketing or other advertising in the Territory (although not direct-to-consumer sales).   If Defendant elected to conduct direct marketing or advertising in the Territory, Distributor was to be informed "and an agreement worked out for sales and pricing for units sold as a result of advertising paid for by the [Defendant]."

65.     The parties continued to operate under the "offset program" detailed above during the term of the Agreement.

66.     At no point prior to the end of their relationship did Defendant ever indicate that the offset program no longer worked or that it was unilaterally ending the program, nor did Defendant ever raise concerns about late payment of invoices, let alone suggest that it would terminate the Agreement on such a basis.

67.     Had Defendant ever told Distributor that it would no longer operate under the offset program, Distributor would have immediately paid any outstanding invoices and would have continued to do the same on a timely basis going forward.

**Defendant Implements Direct to Consumer Sales in United States**

68.     From 2015 to 2017, Defendant substantially increased its direct-to-consumer marketing in the United States using a combination of internet, radio, and television advertising (i.e., infomercials).

69.     Defendant's advertising efforts were apparently successful, as direct-to-consumer sales of Defendant's products increased substantially in the United States from 2015 to 2017, particularly in 2017.

**Canadian Private Equity Firm Acquires Controlling Interest In Defendant**

70.     On or about December 21, 2017, DW Healthcare, a Toronto-based private equity firm, acquired a controlling interest in Defendant.

71.     Press releases from DW Healthcare identified Defendant as offering "a direct-to-consumer in-home cleaning device for CPAP machines that improves health outcomes and quality of life for those suffering from obstructive sleep apnea ("OSA") and other sleep disorders."  The press release further quoted Defendant's CEO, Robert Wilkins, as saying: "We believe an aggressive growth strategy can provide improved health worldwide to those suffering from OSA."

72.     As part of DW Healthcare's acquisition of Defendant, Mr. Schmidt's role with Defendant was effectively eliminated and Distributor's interactions with Mr. Schmidt ceased. Instead, Mr. Wilkins and Defendant's Chief Marketing Officer, Dean Marcarelli, became Distributor's primary points of contact.

73.     On December 28, 2017, Defendant filed documents with the Massachusetts Secretary of the Commonwealth identifying changes to Defendant's officers and directors.  Eric Moore is identified as Defendant's Vice President; Aly Champsi is identified as Assistant Treasurer, Assistant Secretary, and Director; and Andrew Carragher is identified as Director. Upon information and belief, Mssrs. Moore, Champsi, and Carragher are (or were) employees of DW Healthcare.

74.     On February 2, 2018, approximately one month before Defendant terminated the Distribution Agreement, *HME News* published an article about the DW Healthcare acquisition, entitled "SoClean, so global."  In the article, Mr. Wilkins is quoted as saying:  "SoClean is currently sold and available in the U.K. and Australia through distributors . . . .  We are continuing to expand our international reach by opening up direct Amazon marketplaces and new subdirectories in the U.K., Australia, Canada, France and Germany over the next six months.  2018

is all about international expansion." *See* http://www.hmenews.com/article/soclean-so-global (last visited April 13, 2018).

**Defendant Travels to Australia to Strong-Arm Defendant into Accepting New Agreement**

75.     Defendant informed Distributor that Messrs. Wilkins and Marcarelli would be travelling in February and March 2018 to visit distributors in Europe and to meet with Distributor in Australia.  Mr. Wilkins and Mr. Marcarelli also indicated that they were planning a stop in Japan to speak with Distributor's regulatory consultant and other companies.

76.     On Friday, March 2, 2018, Nada and Rischeh had a dinner meeting in Sydney with Mr. Wilkins, his wife, and Mr. Marcarelli.  Nada learned from Mrs. Wilkins at that dinner that Mr. Wilkins and Mr. Marcarelli had spent the day in various business meetings in Sydney, which Distributor was not invited to attend.   On information and belief, those meetings were with advertising and logistics companies, which would be necessary for Defendant to implement a direct-to-consumer sales operation in Australia.

77.     On March 3, 2018 Rischeh sent Messrs. Wilkins and Marcarelli an e-mail requesting further technical  information that was needed to obtain regulatory approval in Japan. Mr. Marcarelli ignored this request and instead responded with an e-mail requesting a meeting and stating: "Rischeh we value your knowledge and experience a great deal and are willing to compensate you for it, however we need to implement our proven business model into both Australia and Japan over the coming months."

78.     At a meeting on the following day, Mr. Wilkins informed Distributor that Defendant no longer wanted a distributor in Australia, but rather wanted to start marketing and selling directly to consumers.

79.     Mr. Wilkins offered to pay Distributor, for a period of one (1) year, $15 to $25 for every unit of product sold only in Australia—with no payments for products sold anywhere else in the Territory.  Distributor would have no costs and Defendant would pay for advertising and other logistics under this proposed new arrangement.  Defendant estimated sales of 36,000 to 40,000 units in Australia in the first year (resulting in a onetime payment of $540,000 to $1,000,000 to Distributor under Mr. Wilkins' proposal, if those sales projections were realized).

80.     Rischeh asked Mr. Wilkins whether Distributor would be left "high and dry" if Defendant's proposed television advertising was not successful.  Mr. Wilkins replied that Defendant would know in three to six months' time the total cost of acquiring a direct-to-consumer customer in Australia, and if their target didn't meet budget they would walk away from the market.

81.     Distributor's projected sales revenues for the Territory for the remaining four years of the Agreement, based on its own conservative projected sales figures that included investing more in marketing, paying higher wholesale prices for product, and obtaining regulatory approval in Japan in 2019, would have been approximately $40 million, with a net profit of $10 million.

82.     Using Defendant's more aggressive projected sales figures, even with a higher wholesale price for product, the amount earned by Distributor under the existing contractual arrangement set forth in the Agreement—*for Australia only*—would have been $3.6 million to $4 million *per year*, and more if sales increased year over year as expected.

83.     Distributor reminded Defendant that the Agreement had four years remaining on its term and that if Defendant wanted to cut out its distributors and start selling directly to consumers, it would need to compensate Distributor for the value of the remaining term of the contract, and that Mr. Wilkins' proposal was insufficient in that regard.

84.     Mr. Marcarelli said: "The headline here is we are taking over the business," and "you will either participate in this change or you won't."  Mr. Marcarelli also threatened to increase the price Defendant was charging Distributor for products if Distributor would not agree to new terms, including an immediate (not to mention extortionate) increase from $115 to $185 per unit, a 60% increase.

85.     After approximately 90 minutes, Mr. Wilkins acknowledged that "the contract says four years, I can see how you think we are screwing you" and asked Distributor to send a proposal to resolve the dispute.

86.     On March 6, 2018 Rischeh received an e-mail from Mr. Wilkins stating:  "[T]he ball is in your court.  You need to provide us a counter proposal to our proposal.  Nothing will move forward until we have a plan that SoClean Inc is happy with."

87.     On March 8, 2018, in response to Mr. Wilkins' March 6, 2018 request, Distributor emailed a proposal to Defendant that Distributor would accept to be bought out of the Agreement across the entire Territory.

**Defendant Terminates the Agreement in Bad-Faith**

88.     Five days after sending its counter-proposal, and before it received any response from Defendant, Distributor received an email from Debra Garcia, who works in Defendant's accounting department in Massachusetts.  Ms. Garcia's email attached spreadsheets reconciling the commissions owed to Distributor and unpaid invoices.

89.     Ms. Garcia wrote:  "We owe you [$]13,300 in PAID commission right now."

90.     The spreadsheets attached to the email also showed $7,255 in unpaid commissions that would become due to Distributor once payment was received from the customer (for a total combined commission owed to Distributor of $20,555).

91.     In other words, products generating a commission of $7,255 to Distributor had been shipped to customers in Asia, but the customers had not yet remitted payment, but were expected to do so in due course (and, upon information and belief, ultimately did so).

92.     Two days later, on March 14, 2018, without any advance notice, Defendant sent Distributor a notice of termination of the Agreement from its headquarters in Massachusetts. The notice claimed that the Agreement was terminated due to unpaid invoices. The notice listed five invoices that were allegedly overdue with a combined total balance of $17,170.83.

93.     Based on the offset program detailed above, the total balance of the invoices identified in the termination notice were less than the commissions then or shortly thereafter owed to Distributor. In fact, had Defendant followed the parties' well-established course of dealing, Defendant would have owed Distributor $3,384.17 once the second set of commissions came due shortly thereafter.

94.     Nevertheless, as a gesture of good faith, Distributor immediately wired Defendant the difference between the purportedly unpaid invoices and the paid commissions, a total of $3,870.83.

95.     Defendant's claim of unpaid invoices is thus mere pretext for terminating the Agreement.

96.     As evidenced by Messrs. Marcarelli's and Wilkins's own words and actions, the true reason for terminating the Agreement was to cut Distributor out so that Defendant could sell directly to consumers in the Territory at a much higher profit margin. Defendant was frustrated that Distributor would not capitulate to its unreasonable demand to allow Defendant to sell directly to consumers. Defendant refused to negotiate on a counter-proposal provided by Distributor. That is why Defendant terminated the Agreement, not because of any allegedly unpaid invoices.

97.     Indeed, Defendant did not provide Distributor with any instructions on what was to be done with incoming orders from customers, customer support for faulty products, current inventory, or outstanding accounts receivable.

98.     After receiving the termination notice, Distributor attempted to sell its remaining stock of Defendant's products in an effort to mitigate its damages.  However, upon learning that Defendant had terminated the Agreement, none of Distributor's customers would purchase the inventory because they were concerned Defendant would not provide customer support if the customers experienced problems with the products.

99.     On March 20, 2018, counsel for Distributor sent Defendant a letter, informing Defendant that its termination of the Agreement was done in bad faith and offering to resolve the dispute before initiating litigation.

100.     On March 27, 2018, counsel for Defendant responded to Distributor's letter, refusing to engage in any meaningful settlement of the issues raised herein, and demanding that Distributor stop holding itself out as being associated with Defendant.

101.     Defendant's abrupt, bad-faith termination of the Agreement has completely destroyed Distributor's business, which was 100% based upon selling Defendant's products in the Territory, deprived Distributor of more than four years' of profits and the benefits of its investments in time and capital, irreparably harmed its relationships with its customers, and left it saddled with thousands of dollars of products that it cannot sell.

## COUNT I
### (Breach of Contract)

102.     Distributor repeats and realleges each and every allegation contained in Paragraphs 1 through 101 of the Complaint, as if fully set forth herein.

103.     On April 3, 2017, Defendant entered into the Agreement with Distributor.

104.    The Agreement is a valid and enforceable contract.

105.    Distributor has performed all of the duties and obligations it owed Defendant under the Agreement.

106.    Defendant breached the Agreement by terminating it in bad faith and without justification.

107.    Distributor has incurred significant damage as a result of Defendant's breach of the Agreement, including, but not limited to, loss of future sales, harm to its relationships with its customers, and being unable to sell its remaining stock of Defendant's products.

## COUNT II
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

108.    Distributor repeats and realleges each and every allegation contained in Paragraphs 1 through 107 of the Complaint, as if fully set forth herein.

109.    Under Massachusetts law, parties to a commercial contract have a duty to exercise any discretionary right granted by such contract in good faith and consistent with the common purpose of the agreement and the parties' reasonable expectations of one another.

110.    Despite the parties' well-established course of dealing of offsetting invoices with commissions owed to Distributor, Defendant terminated the agreement based on allegedly past due invoices even though Defendant owed (or would soon owe) Distributor commissions sufficient to cover the unpaid invoices.

111.    Defendant made this decision not because the invoices were past due, but because it was upset that Distributor would not agree to Defendant's unreasonable terms to end the Agreement and allow it to sell directly to consumers in the Territory, as evidenced by its executives' own statements and conduct.

112.    Defendant's conduct has injured or destroyed Distributor's right and ability to realize the value of the Agreement.

113.    By terminating the Agreement in bad faith and without justification, Defendant has breached the implied covenant of good faith and fair dealing implied in all contracts, including the Agreement.

### COUNT III
**(Unfair and Deceptive Trade Practices in Violation of M.G.L. Chapter 93A, §§ 2, 11)**

114.    Distributor repeats and realleges each and every allegation contained in Paragraphs 1 through 113 of the Complaint, as if fully set forth herein.

115.    Sections 2 and 11 of the Massachusetts Consumer Protection and Unfair Trade Practices Act, M.G.L. c. 93A, make it unlawful for "any person who engaged in the conduct of trade or commerce . . . [to engage in] an unfair method of competition or an unfair or deceptive act or practice. . . ."

116.    Section of 11 of Chapter 93A further provides that any person who engages in trade or commerce and who suffers any loss of money as the result of such conduct is entitled to multiple damages, attorneys' fees, costs and equitable relief.

117.    Defendant is a "person engaged in the conduct of trade or commerce" as defined by Chapter 93A.

118.    By its conduct described above—including but not limited to abruptly terminating the Agreement in bad faith and without justification based on pretext—Defendant has committed unfair and deceptive trade practices in violation of Chapter 93A.

119.    Defendant's wrongful conduct occurred primarily and substantially in Massachusetts.

120.   As a result of Defendant's conduct, Distributor has suffered harm and is entitled to treble damages, attorneys' fees, and costs.

**COUNT IV**
**(Unjust Enrichment)**

121.   Distributor repeats and realleges each and every allegation contained in Paragraphs 1 through 120 of the Complaint, as if fully set forth herein.

122.   Distributor has invested substantial time and capital to obtain regulatory approval to sell Defendant's products in various countries in the Territory.

123.   Distributor expected that it would receive the benefit of its efforts by being able to sell Defendant's products in the Territory during the five-year term of the Agreement, and beyond.

124.   Defendant's bad faith termination of the Agreement has prevented Distributor from receiving the full benefit of its efforts.

125.   Defendant has received, and will continue to receive, the benefit of Distributor's efforts by being able to sell its products in countries in which Distributor obtained regulatory approval, and by being able to more quickly obtain regulatory approval in Japan based on Distributor's previous work.

126.   It would be inequitable for Defendant to receive the benefit of Distributor's efforts without payment for its value.

**WHEREFORE**, Distributor respectfully requests that this Court:

1.   Enter judgment against Defendant for compensatory damages in an amount to be determined at trial;

2.   Enter judgement against Defendant for treble damages;

3.   Award Distributor the costs and expenses, including reasonable attorneys' fees; and

4.   Award Distributor such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Distributor hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

**SOCLEAN2 PTY LTD**,

By its attorneys,

_/s/ Erik W. Weibust_
Erik W. Weibust (BBO # 663270)
  eweibust@seyfarth.com
Dallin Wilson (BBO # 676662)
  drwilson@seyfarth.com
SEYFARTH SHAW LLP
Two Seaport Lane, Suite 300
Boston, Massachusetts  02210
Tel: (617) 946-4800

Dated:  April 13, 2018